**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

CONNIE BASCO, in her individual )
capacity and as Personal Representative )
of the Estate of STAR SHELLS, )
deceased, et al. )
                            )
     Plaintiffs, )
                            )
v. )          Case No. CIV-23-1143-G
                            )
CITY OF OKLAHOMA CITY, )
                            )
     Defendant. )

**ORDER**

Now before the Court is a Motion for Partial Summary Judgment (Doc. No. 66) filed by Defendant City of Oklahoma City.   A joint Response (Doc. No. 82) was filed by Plaintiffs Connie Basco, in her individual capacity and as Personal Representative of the Estate of Star Shells, and Elijah Reeves, in his individual capacity and as Personal Representative of the Estate of Elijah Reeves III.   Defendant has replied (Doc. No. 95).

I.     *Factual Background and Plaintiffs' Claims*

Plaintiffs initially filed this action in the District Court of Oklahoma County, Oklahoma.   *See Basco v. City of Okla. City*, No. CJ-2023-2931 (Okla. Cnty. Dist. Ct.).   Defendant then removed the case to federal court on the basis of federal-question jurisdiction.   *See* Notice of Removal (Doc. No. 1) (citing 28 U.S.C. §§ 1331, 1343).

Plaintiffs' claims arise from the death of Star Shells and her unborn child on May 24, 2021, in Oklahoma City, Oklahoma.   Plaintiff Basco is the mother of the late Ms. Shells and Plaintiff Reeves is the father of the late Elijah Reeves III ("Elijah").   *See* Am.

Compl. ¶¶ 6-7 (Doc. No. 20); Answer ¶¶ 6-7 (Doc. No. 33).   Defendant is a municipality responsible for the operation of the Oklahoma City Police Department ("OCPD") and its law enforcement officers.   Am. Compl. ¶ 8; Answer ¶ 8.

At 7:30 a.m. on Monday, May 24, 2021, Manuel Ochoa and Gerardo Ochoa made separate calls to 911 to report that Manuel Ochoa's black Ford 350 pickup truck (the "Truck") had been stolen.   Grayson Dep. 81:19-84:10, 89:18-24, 90:12-15, 92:4-94:16, Def.'s Ex. 1 (Doc. No. 66-1).   Manuel Ochoa reported that the Truck had been parked and running with the keys inside and then driven away by a male.   *Id.* at 93:7-14.   The driver of the Truck was later identified as Wacey Mikles.   *See* OCPD Incident Rep. at 5, Def.'s Ex. 6 (Doc. No. 66-6).

OCPD Officer Jon Hawkins was dispatched to the location, 2507 South Central Avenue in Oklahoma City, in reference to a larceny of a motor vehicle.   Am. Compl. ¶¶ 18-19, 29; Answer ¶¶ 18-19, 29.   While speaking with the Ochoas, Officer Hawkins learned that the Truck was equipped with a GPS device and could be tracked with the use of an application on Gerardo Ochoa's phone.   Hawkins Dep. 106:1-3, Def.'s Ex. 5 (Doc. No. 66-5).   At 7:48 a.m., Officer Hawkins informed OCPD dispatch that the Truck was located at Northeast 8th Street and Lincoln Boulevard.   *Id.* at 140:19-25; OCPD Detail Rep. at 4, Def.'s Ex. 3 (Doc. No. 66-3).   Over the next few minutes, Officer Hawkins and his partner relayed to dispatch updated locations for the Truck.   *See* OCPD Detail Rep. at 4-5.

At approximately 7:59 a.m., the Truck was spotted traveling northbound on Lincoln Boulevard.   *See id.* at 5.   OCPD Officer Dustin Fulton was on patrol nearby and was

assigned to the call.   Fulton Dep. 56:20-58:3, Def.'s Ex. 8 (Doc. No. 66-8).   Officer Fulton located the Truck at the intersection of Northeast 30th Street and Lincoln Boulevard while the Truck was stopped at a red light in the left turn lane.   *Id.* at 58:23-59:14.   Officer Fulton positioned his patrol vehicle directly behind the stolen vehicle.   *Id.* at 58:23-25. OCPD Officer Greg Bell also arrived and positioned his patrol vehicle directly behind Officer Fulton.   *Id.* at 58:20-22.

Officer Fulton communicated to dispatch that he was going to proceed with a "high risk stop."   *Id.* at 59:5-12.   Officer Fulton engaged his overhead lights and got out of his patrol vehicle, intending to give commands to the suspect.   *Id.* at 59:22-60:3.   Rather than submitting to the traffic stop, however, Mr. Mikles accelerated through the red turn light and turned westbound onto Northeast 30th Street.   *Id.* at 59:22-60:5, 64:2-15.   Officer Fulton jumped back into his patrol vehicle and he and Officer Bell initiated a pursuit, with Fulton as the primary pursuit officer and Bell as secondary officer.   *Id.* at 64:16-24, 93:11-23; Bell Dep. 27:7-13, 28:7-19, 36:19-37:4, Def.'s Ex. 9 (Doc. No. 66-9); *see* Fulton Body Camera Video, Def.'s Ex. 10 (Doc. No. 66-10).   As primary officer, Officer Fulton called out updates on the radio as to speed, traffic conditions, and direction of travel as the pursuit passed through each major intersection.   *See* Fulton Dep. 93:15-17, 94:3-11, 96:9-20.

OCPD Officer Anthony Riley heard over the radio that a stolen vehicle was currently located at an intersection within his patrol area.   Riley Dep. 12:16-13:23, Def.'s Ex. 11 (Doc. No. 66-11).   When the pursuit of the Truck began, Officer Riley proceeded toward the area, assumed the role of supervisor, and worked to coordinate the pursuit.   *Id.* at 13:7-14:24; *see* OCPD Admin. Investigation Rep. at 24-25, Def.'s Ex. 30 (Doc. No. 66-

30).

Mr. Mikles drove the Truck west on Northeast 30th Street, quickly accelerating to speeds of approximately 83 mph in a 25 mph zone. OCPD Admin. Investigation Rep. at 7; Pursuit Route at 1-2, Def.'s Ex. 12 (Doc. No. 66-12). He turned north on Santa Fe Avenue, reaching speeds of approximately 98 mph and then slowing as the Truck approached Northeast 50th Street. Fulton Dep. 93:11-94:23, 95:17-25, 97:5-20; Pursuit Route at 1-2; OCPD Admin. Investigation Rep. at 7. During this time, traffic on the roads was very light. Fulton Dep. 97:8-98:6, 106:15-107:9. Mr. Mikles kept the Truck on the inside lane of Santa Fe Avenue as he drove through the intersection at Northeast 50th Street, where vehicles had stopped. *Id.* at 97:8-20.

At Northeast 53rd Street, Mr. Mikles turned east, entering a mixed commercial/ industrial area where the speed limits were 25 mph. Mr. Mikles led the pursuit one block east, then one block south, one block east again, and then two blocks south. Pursuit Route at 1-2. At Walnut Avenue and Northeast 50th Street, another OCPD officer had positioned his patrol car to block the roadway. When Mr. Mikles reached the intersection, he drove around the patrol vehicle, through the grass to the east of the roadway and a commercial entrance, and onto Northeast 50th Street. Fulton Dep. 99:1-9; OCPD Admin. Investigation Rep. at 7. Mr. Mikles proceeded east on Northeast 50th Street through the intersection at Lincoln Boulevard, where officers had positioned their patrol vehicles to block oncoming traffic, then through the intersection at Kelley Avenue, where another officer had blocked traffic ahead of the pursuit. Fulton Dep. 101:9-16, 102:24-103:3.

At Martin Luther King Avenue, Mr. Mikles turned the Truck south. *Id.* at 103:3-

13.  As the pursuit headed south, toward Northeast 23rd Street, an officer reported light traffic to the dispatcher.   OCPD Detail Rep. at 8.

When the Truck reached the intersection of Northeast 23rd Street and Martin Luther King Avenue, Officer Fulton observed that eastbound and westbound traffic had green lights and that officers had not been able to shut down the intersection ahead of the pursuit. Fulton Dep. 110:13-22.   The Truck ran the red light and weaved through traffic to cross the intersection without collision.   OCPD Admin. Investigation Rep. at 9.

Officer Fulton, still following, slowed down to get through the intersection and temporarily lost sight of the Truck as it crested a hill on Martin King Avenue near the intersection with Northeast 20th Street.   *Id.*; Fulton Dep. 111:15-17.   As Officer Fulton's vehicle approached the hill, Officer Fulton "was making the decision to call off the pursuit."   Fulton Suppl. Dep. 210:20-25, Def.'s Reply Ex. 1 (Doc. No. 95-1); OCPD Admin. Investigation Rep. at 9-10.   Officer Fulton decided to terminate the pursuit after observing the Truck "come close to entering a crash and placing other individuals in danger directly."   Fulton Dep. 106:10-11, 110:13-22; Fulton Suppl. Dep. 210:20-25.   As Officer Fulton's patrol vehicle crested the hill, he observed flashing school-zone lights and vehicle traffic ahead near Northeast 16th Street.   Fulton Dep. 110:12-22; Fulton Suppl. Dep. 210:1-8; OCPD Admin. Investigation at 9-10.

Officer Fulton intended to "come up to the top of the hill," radio the Truck's last known direction of travel to dispatch, and terminate the pursuit.   Fulton Dep. 111:17-22; Fulton Suppl. Dep. 211:1-8.   Before Officer Fulton had conveyed the information or terminated the pursuit, however, Office Fulton observed Ms. Shells' vehicle traveling east

through the intersection and what he described as the "inevitable" collision between the Truck and the 2009 Chevrolet Impala driven by Ms. Shells.   Fulton Dep. 111:24-112:5; Fulton Suppl. Dep. 211:6-17.   The Truck ran the red light at the intersection of Northeast 16th Street and Martin Luther King Avenue and collided with the Impala.   Fulton Dep. 111:24-112:5; Fulton Suppl. Dep. 211:9-17; Def.'s Mot. at 12; Pls.' Resp. at 7.   Officer Fulton called for emergency responders to report to the scene.   OCPD Admin. Investigation Rep. at 10.

Ms. Shells died on the scene from injuries sustained in the collision.   Am. Compl. ¶ 27; Answer ¶ 27.   She was approximately six months pregnant with Elijah, who also died.   Am. Compl. ¶ 28; Answer ¶ 28.[1]

The pursuit lasted five minutes and 55 seconds.   OCPD Admin. Investigation Rep. at 2.   During that time, Mr. Mikles disregarded at least one stop sign and three red lights. Bell Dep. 52:21-53:7, 108:8-15.   Automatic vehicle location data retrieved from OCPD patrol vehicles show that speeds during the pursuit greatly exceeded the posted speed limits, at times approaching 100 mph.   Pursuit Route at 1-2.

Following the May 24, 2021 pursuit, the OCPD initiated an internal affairs investigation.   *See* OCPD Admin. Investigation Rep. at 1.   Officers Fulton, Bell, and Riley were placed on restricted duty pending the results of the investigation.   Restricted Duty Memos, Def.'s Exs. 22, 23, 24 (Doc. Nos. 66-22, -23, -24).

---

[1] Mr. Mikles was sentenced to a term of imprisonment after pleading guilty in state court to larceny of an automobile, unlawful possession of methamphetamine, driving without a license, and two counts of second-degree murder.   *See* Mikles Crim. Case Record, Def.'s Ex. 14 (Doc. No. 66-14).

As of May 24, 2021, Defendant, through OCPD, had adopted written policies governing police pursuits. These policies were codified in the OCPD Operations Manual as Procedures 220.40 through 220.80. OCPD Operations Manual at 1-10, Def.'s Ex. 15 (Doc. No. 66-15); Gourley Dep. 161:1-23, Def.'s Ex. 16 (Doc. No. 66-16); Swanson Dep. 80:11-81:16, Def.'s Ex. 17 (Doc. No. 66-17); Kettler Dep. 109:2-111:12, Def.'s Ex. 21 (Doc. No. 66-21). The OCPD's investigation determined that the pursuit of Mr. Mikles on May 24, 2021, violated these policies, finding that at issue was a nonviolent property crime and there was no immediate need for apprehension that would outweigh the danger presented by a high-speed pursuit through populated areas. Fulton Dep. 155:15-20; Bell Dep. 47:11-53:22; Riley Dep. 65:2-66:11, 74:25-77:20; Gourley Dep. 264:1-11; Fredrickson Dep. 81:10-83:9, Def.'s Ex. 20 (Doc. No. 66-20); Officer Reprimands, Def.'s Exs. 25, 26, 27, 28, 29 (Doc. Nos. 66-25, -26, -27, -28, -29); OCPD Admin. Investigation Rep. at 14-17, 21-24, 28-30.

As a result of the violation of OCPD policies, Officers Fulton, Bell, and Riley were formally reprimanded and provided with re-training in the Reality Based Training Unit. Officer Fulton was suspended for eight days without pay. Additionally, Officers Bell and Riley were each suspended from their positions as field training officers for one year and suspended as Law Enforcement Driving Tactics instructors for six months. Fulton Dep. 155:15-20, 165:13-166:9; Bell Dep. 46:1-53:22, 73:19-74:20; Riley Dep. 65:2-66:11, 74:25-77:20; Fulton Reprimand at 1-2, Pls.' Ex. 6 (Doc. No. 82-6). The captain on duty, Captain Paul Fredrickson, and the division commander, Major Kreg Kettler, were issued formal reprimands because they monitored the pursuit on the radio and failed to terminate

the pursuit.   Gourley Dep. 42:5-42:22; Fredrickson Dep. 35:5-37:8, 38:6-39:24, 40:22-41:2, 79:12-25, 80:14-81:2; Kettler Dep. 82:21-84:9; OCPD Admin. Investigative Rep. at 33-35.

Plaintiffs allege that the OCPD officers' conduct "caused the driver of the stolen vehicle to drive recklessly at high rates of speed, and strike the vehicle of [Ms. Shells], causing her death and the death of her unborn child."   Am. Compl. ¶ 4.   Plaintiffs, as representatives of the decedents, bring claims pursuant to 42 U.S.C. § 1983 against Defendant for violation of their substantive due process rights and equal protection rights under the Fourteenth Amendment.   *See id.* ¶¶ 1, 58, 63-66.   Plaintiffs additionally seek relief under Oklahoma law on various theories of negligence.   *See id.* ¶¶ 78-83.

## II.    Summary Judgment Standard

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury.   *See Garrison v.*

8

*Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

III.    *Defendant's Motion for Summary Judgment*

A.  *Plaintiffs' Equal Protection Claim*

Although Plaintiffs pleaded a claim for denial of equal protection under the Fourteenth Amendment, they do not address this claim in their summary-judgment briefing. *See* Am. Compl. ¶¶ 63, 66, 69. Having reviewed the relevant record, the Court agrees with Defendant there are no facts or evidence to support such a claim at trial. *See* Def.'s Mot. at 34. Defendant is therefore entitled to judgment as a matter of law on

Plaintiffs' equal protection claim.

### B.  Plaintiffs' Substantive Due Process Claim

In their remaining 42 U.S.C. § 1983 claim, Plaintiffs assert that Defendant is liable because the police pursuit violated their substantive due process rights.  *See* Am. Compl. ¶¶ 53-72.  This claim "find[s] [its] basis in the Fourteenth Amendment's protections against arbitrary government power."  *Lindsey v. Hyler*, 918 F.3d 1109, 1115 (10th Cir. 2019).  "To succeed on such a claim, an individual must demonstrate that the government deprived him of life, liberty, or property without due process of law."  *Id.*

A municipality such as Defendant City of Oklahoma City "may not be held liable under § 1983 solely because its employee inflicted injury."  *Burke v. Glanz*, 292 F. Supp. 3d 1235, 1249 (N.D. Okla. 2017).  Rather, to hold Defendant liable for a deprivation of Plaintiffs' federally protected rights, Plaintiffs must: (1) identify "the existence of a municipal policy or custom by which [Plaintiffs] [were] denied a constitutional right"; and (2) demonstrate "that the policy or custom was the moving force behind the constitutional deprivation."  *Id.* (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)).  Stated differently, Plaintiffs must prove a "municipal policy or custom," "causation," and "state of mind."  *Bond v. Sheriff of Ottawa Cnty.*, 173 F.4th 1265, 1291 (10th Cir. 2026) (internal quotation marks omitted).

Defendant argues that Plaintiffs cannot prove that an OCPD officer's actions in carrying out the pursuit of the Truck deprived Plaintiffs of a constitutional right and that therefore Plaintiffs are unable to establish municipal liability (also referred to as "*Monell* liability") under § 1983.  *See* Def.'s Mot. at 7, 17-27; *Burke*, 292 F. Supp. 3d at 1249.

10

The Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), "is the starting point when considering a substantive due process claim resulting from a highspeed chase."   *Graves v. Thomas*, 450 F.3d 1215, 1221 (10th Cir. 2006).   In *Lewis*, the Supreme Court "held that a 'cognizable level of executive abuse of power is that which shocks the conscience.'"   *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009) (alteration omitted) (quoting *Lewis*, 523 U.S. at 846).

> While noting that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," the Court observed that it is a "closer call" whether "the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence."   *Lewis*, 523 U.S. at 849. As applied to high-speed police pursuits, the Court held that "highspeed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983."

*Green*, 574 F.3d at 1300-01 (10th Cir. 2009) (alteration and citations omitted); *see also Lindsey*, 918 F.3d at 1116 ("Only the most egregious official conduct can be said to be arbitrary in the constitutional sense." (alteration and internal quotation marks omitted)).

Defendant argues that, as Plaintiffs cannot show that any specific OCPD officer "intended to harm" the decedents or that any officer's conduct "demonstrate[d] a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking," Plaintiffs cannot establish Defendant's liability for a violation of substantive due process.   *Green*, 574 F.3d at 1302-03 (internal quotation marks omitted); *see* Def.'s Mot. at 18-27; *see also Trigalet v. City of Tulsa*, 239 F.3d 1150, 1154 (10th Cir. 2001) ("[A] municipality cannot be liable under § 1983 for its employees' actions . . . if a jury

11

finds that the municipal employee committed no constitutional violation." (internal quotation marks omitted)).    Plaintiffs in response do not attempt to show that a pursuing OCPD officer violated the decedents' substantive due process rights under *Lewis* and its progeny.    Rather, Plaintiffs argue that Defendant can be held liable for its "deliberate indifference to the dangers presented by pursuits" even if no OCPD officer's conduct constituted a substantive due process violation.    Pls.' Resp. at 24, 27-32 (arguing that Defendant had a "widespread practice of engaging in high risk, low reward pursuits").[2]

In support, Plaintiffs first cite *Fagan v. City of Vineland*, a decision in which the Third Circuit held that "in a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution."    *Fagan*, 22 F.3d 1283, 1292 (3d Cir. 1994); *see* Pls.' Resp. at 27-28.    The Tenth Circuit has rejected *Fagan* and the proposition set forth by Plaintiff, however, concluding instead that a municipality cannot be held liable if its employees' conduct "do[es] not constitute a violation of a plaintiff's constitutional rights" and there "are no unconstitutional acts by an individual officer."    *Trigalet*, 239 F.3d at 1151, 1154-56; *accord Tompkins v. City of Hartshorne*, No. 94-7174, 1995 WL 769004, at *4 (10th Cir.

---

[2] "Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."    *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010) (alteration and internal quotation marks omitted).    Plaintiffs expressly disclaim any claim based upon OCPD's official written policy.    *See* Pls.' Resp. at 24.    "Municipal liability . . . may be based on an informal 'custom,'" however, "so long as this custom amounts to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."    *Brammer-Hoelter*, 602 F.3d at 1189 (internal quotation marks omitted).

Dec. 29, 1995) ("[O]nce we conclude that the police officer did not violate the plaintiffs' constitutional rights, any claim against the municipality for inadequate training, supervision, and pursuit policies must be dismissed."); *see also Romero v. Pro Sec., LLC*, No. CIV-16-595-R, 2017 WL 1929663, at *3 (W.D. Okla. May 9, 2017); *Rodriguez v. Miller*, No. CIV-01-836, 2002 WL 35649848, at *14 & n.28 (D.N.M. July 15, 2002). And the officers' violation of internal policy does not, by itself, make the pursuit violative of any federal constitutional right. *See Tanberg v. Sholtis*, 401 F.3d 1151, 1159-60 (10th Cir. 2005). The Court therefore will not apply *Fagan* to permit municipal liability to lie against Defendant absent a "predicate constitutional violation" by an OCPD officer or officers. *Trigalet*, 239 F.3d at 1154.

Next, Plaintiffs argue that, "even when an individual officer is not liable," Defendant may still be held liable for its decisonmakers' alleged "creat[ion] and maint[enance] [of] a custom of conducting high-risk chases for low-reward apprehensions" pursuant to *Crowson v. Washington County*, 983 F.3d 1166 (10th Cir. 2020). Pls.' Resp. at 24-26, 28-32. In *Crowson*, the Tenth Circuit considered a municipal-liability § 1983 claim for deliberate indifference to medical care raised against a county by one of the inmates at the county's correctional facility. *See Crowson*, 983 F.3d at 1173-74, 1176, 1184-92. The inmate sought to hold the County liable on "a systemic failure theory," arguing that the county's failure to adopt written policies for the facility's medical staff resulted in the inmate's injuries and violated the Fourteenth Amendment. *Id.* at 1174, 1184-85. The Tenth Circuit reiterated its holding of *Trigalet* that, as a general rule, "there must be a constitutional violation, not just an unconstitutional policy, for a municipality to

be held liable." *Id.* at 1191. "In most cases, this makes the question of whether a municipality is liable dependent on whether a specific municipal officer violated an individual's constitutional rights." *Id.*

The appellate court noted a "limited exception" that applies when "the municipal policy devolves responsibility across multiple officers":

> In those situations, the policies may be unconstitutional precisely because they fail to ensure that any single officer is positioned to prevent the constitutional violation. Where the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable. That is, the municipality may not escape liability by acting through twenty hands rather than two.

*Id.* at 1185-86, 1191 (citing *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 305-10 (10th Cir. 1985)); *see Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023) ("In the Tenth Circuit, while unusual, municipal liability may exist without individual liability: for example, for a systemic failure of medical policies and procedures.").

For several reasons, Plaintiffs' reliance on *Crowson* fails to establish that Defendant can be held liable on a Fourteenth Amendment substantive due process claim for the events of May 24, 2021. First, to the extent that Plaintiffs again suggest that municipal liability could attach even absent an underlying constitutional violation, *see* Pls.' Resp. at 28-29, the Tenth Circuit has rejected this reading of *Crowson*. *See Bond*, 173 F.4th at 1297 n.22 ("*Crowson* did not relieve a plaintiff of the fundamental burden of showing a constitutional violation as a predicate to *Monell* liability.").

Second, the "systemic failure" theory assigns liability to the municipality when responsibility is "devolve[d]" across multiple officers and the municipality's policy "fail[s]

to ensure that any single officer is positioned to prevent the constitutional violation." *Crowson*, 983 F.3d at 1191.   Here, however, it is undisputed that—pursuant to the OCPD's widespread custom that Plaintiffs allege was the cause of the "systemic violation carried out by multiple actors"—any one of the OCPD officers involved in the pursuit could have terminated it.   *Lucas*, 58 F.4th at 1144; *see* Bell Dep. 27:7-28:6, 30:8-31:1; Riley Dep. 55:4-10, 85:17-87:23; Gourley Dep. 92:24-93:15; Pls.' Resp. at 7.   In such circumstances, it cannot be said that the OCPD policies precluded "any single officer" from "prevent[ing] the constitutional violation."   *Crowson*, 983 F.3d at 1191.   Plaintiffs thus have not shown that the *Crowson* limited exception applies.[3]

Because Plaintiffs have "failed to establish a constitutional violation, no liability can attach to" Defendant.   *Lindsey*, 918 F.3d at 1117; *see Trigalet*, 239 F.3d at 1154. Defendant is entitled to judgment as a matter of law on this claim under Rule 56(a).

### C.  Plaintiffs' State-Law Negligence Claims

Defendants' removal and the invocation of subject-matter jurisdiction in this matter were premised upon the federal questions presented by Plaintiffs' Fourteenth Amendment claims.   As outlined above, Defendant is entitled to summary judgment on those claims.

---

[3] This discrepancy also prevents Plaintiffs from establishing the requisite "direct causal link" between OCPD's informal custom of engaging in dangerous pursuits and the injury alleged.   *Barre v. Ramsey*, 601 F. Supp. 3d 1038, 1063 (N.D. Okla. 2022) (internal quotation marks omitted); *cf. id.* at 1064 (rejecting municipal-liability claim where "[t]he constitutional harm was [the plaintiff's] death caused by the use of force . . . , not by the policies or absence of policies with respect to what occurred in the days leading up to the incident").   "A plaintiff can establish a direct causal link only by showing that the municipal practice was closely related to the deprivation of rights."   *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022).

Plaintiffs' remaining claims are raised pursuant to Oklahoma law. *See* Am. Compl. ¶¶ 73-83. Defendant does not seek summary judgment on these negligence claims, instead requesting that the claims be remanded to state court. *See* Def.'s Mot. at 34-35. Plaintiffs did not object or otherwise respond to that request. As the parties' state-law claims and defenses "warrant[] a[n] [Oklahoma] state court's consideration," the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining claims and will remand them back to the state court for disposition. *Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1089, 1103 (10th Cir. 2020); *see* 28 U.S.C. § 1367(c).

### CONCLUSION

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment (Doc. No. 66) is GRANTED. A separate judgment shall be entered upon Plaintiffs' federal claims.

The pending Motions (Doc. Nos. 104, 106, 114) are DENIED as moot.

IT IS FURTHER ORDERED that Plaintiffs' claims brought pursuant to state law are REMANDED to the District Court of Oklahoma County, Oklahoma.

The Clerk of this Court is directed to send a certified copy of this Order to the Court Clerk of the District Court of Oklahoma County, Oklahoma.

IT IS SO ORDERED this 2nd day of July, 2026.

_____
CHARLES B. GOODWIN
United States District Judge

16